IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PERCY TOMPKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 09 C 3906 |
| | ) |
| BANK OF AMERICA | ) |
| CORPORATION, et al., | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendants' motion for summary judgment. For the reasons stated below, the court grants the motion for summary judgment.

### BACKGROUND

Plaintiff Percy Tompkins (Tompkins), who is an African American male, began working as an Assistant Vice President and Branch Manager for Defendant LaSalle Bank, N.A., a subsidiary of Defendant LaSalle Bank Corporation (LaSalle), on August 30, 2004, at the Matteson, Illinois branch (Matteson Branch). Tompkins contends that he was hired by and annually evaluated by an Area Manager named

1

Sharon Esposito (Esposito), who is a Caucasian female. Tompkins also contends that Esposito gave him favorable performance reviews in 2004, 2005, and 2006. According to Tompkins, Esposito was promoted to a new position in June of 2007, and Mark Henry (Henry), an African American male, assumed Esposito's position as Area Manager. Tompkins claims that he was notified sometime in September of 2007 that he was being transferred to the Joliet, Illinois branch (Joliet Branch).

On or about October 1, 2007, Defendant Bank of America Corporation purchased LaSalle's parent company, and Tompkins was transferred to the Joliet Branch. Tompkins contends that his transfer to the Joliet Branch decreased his responsibilities and resulted in lost income opportunities. Tompkins' position at the Matteson Branch was allegedly assumed by Stan Benes (Benes), a Caucasian male, who had previously been the Branch Manager of both the Joliet Branch and a branch in New Lennox, Illinois (New Lennox Branch).

Tompkins contends that sometime in October of 2007, new "Standards of Conduct" policies were implemented. Tompkins also contends that soon after that, he responded to a fax sent to him by Benes regarding an audit (Audit) being conducted by FlagStar Bank (FlagStar), which related to some verification of deposit forms (VOD Forms) that had been completed for Worldwide Bank and Finance (Worldwide), a customer of Defendants. Tompkins claims that since neither the fax itself nor Benes indicated that the Audit was confidential, Tompkins forwarded the fax to Worldwide in an effort to investigate the problems that Benes had identified

with the VOD Forms. Tompkins states that he was terminated on October 22, 2007, allegedly for his actions relating to the Audit. Tompkins claims that Benes and another manager involved in the Audit, Margie Black (Black), who is a Caucasian female, did not suffer any disciplinary action as a result of the incident. Tompkins also contends that after his termination, he was replaced by Diana Kelly (Kelly), a Caucasian female who had been Assistant Branch Manager at the Joliet Branch prior to Tompkins' termination.

Tompkins includes in his amended complaint a claim alleging race discrimination in violation of the Illinois Human Rights Act (IHRA), 775 ILCS 5/2-101, *et. seq.* (Count I), a claim alleging race discrimination in violation of Title VII of the Civil Rights Act of 1966 (Title VII), 42 U.S.C. § 2000e *et seq.* (Count II), and a claim alleging race discrimination in violation of 42 U.S.C. § 1981 (Section 1981) (Count III). Defendants move for summary judgment on all claims.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

To defeat a defendant's motion for summary judgment on a Title VII discrimination claim, a plaintiff can proceed under the direct or indirect method of proof. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010).

4

At the summary judgment stage, courts generally apply the same analysis to discrimination claims brought pursuant to Section 1981 or the IHRA that courts apply to Title VII claims. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007)(stating that courts "generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981"); *Keri v. Board of Trustees of Purdue University*, 458 F.3d 620, 641 n.5 (7th Cir. 2006)(stating that "both Title VII and § 1981 employ the same analysis"); *Zaderaka v. Illinois Human Rights Com'n*, 545 N.E.2d 684, 687 (Ill. 1989)(adopting "the analytical framework . . . addressing claims brought under Title VII" to an employment discrimination claim brought pursuant to the IDHA).

I.  Direct Method

Tompkins argues that he is able to proceed under the direct method of proof. To proceed under the direct method of proof, a plaintiff must point to "direct evidence of-or sufficient circumstantial evidence to allow an inference of-intentional [unlawful] discrimination by [the defendant]." *Montgomery*, 626 F.3d at 393 (also stating that "[r]egardless of the type of evidence presented, [the plaintiff] may avoid summary judgment only by presenting sufficient evidence to create a triable issue as to whether his demotion had a discriminatory motivation"); *see also Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006)(stating that a plaintiff could show "a convincing mosaic of circumstantial evidence as an alternative 'direct' method to direct evidence of establishing the prima facie

case")(internal quotations omitted). Tompkins concedes that he "does not have any 'direct evidence' of discrimination," but contends that he has presented enough circumstantial evidence to avoid summary judgment. (Resp. 3).

When evaluating circumstantial evidence, the court "cannot view the record in small pieces that are mutually exclusive of each other," but must instead consider the evidence as a whole. *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1115 (7th Cir. 2009)(citations omitted)(internal quotations omitted); *see also Sylvester*, 453 F.3d at 903 (indicating that "[a] case of discrimination can . . . be made by assembling a number of pieces of evidence none meaningful in itself, . . . [that], when taken as a whole, provide strong support if all point in the same direction"). Where circumstantial evidence is offered, it "must 'point directly to a discriminatory reason for the employer's action.'" *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010)(quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)). Such circumstantial evidence generally falls into one of three categories: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; [or] (3) evidence that the employee [suffered an adverse employment action] and [that] the employer's reason is a pretext for discrimination." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)(citations omitted). Tompkins argues that he has pointed to circumstantial evidence of discrimination that falls under each category,

arguing that the evidence shows (1) that Esposito was involved in the hiring of non-African American employees at the Matteson Branch, (2) that Tompkins was the only employee who suffered any disciplinary action because of the Audit, and (3) that he was replaced by less-qualified Caucasian employees when he was transferred and later terminated, which shows that Defendants' reasons were a pretext for discrimination.

### A. Esposito's Involvement in Hiring of Non-African Americans

Tompkins contends that Esposito was involved in the hiring of non-African American employees at the Matteson Branch and that it was "suspicious activity" sufficient to create an inference of discriminatory intent with respect to Tompkins' transfer and termination. (Resp. 5). The court notes that Defendants have denied that Esposito was involved in the hiring of non-African Americans at the Matteson Branch. (R SAF Par. 2, 4-8). Regardless, the record shows that the hiring pointed to by Tompkins allegedly occurred in 2004 and 2005. (R SAF Par. 9); (Tompkins dep. 39). Even if Esposito was involved in the hiring of non-African American employees at the Matteson Branch, such facts would not create a strong inference of discrimination, since the alleged hiring occurred two to three years prior to Tompkins' transfer and termination. *Cf. Nagle*, 554 F.3d at 1115 (indicating that remarks "made at a time that is too distant from when the adverse action occurred" do not "suggest that discrimination motivated the action"); *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007)(discussing the evidentiary

7

weight of temporal proximity in establishing causation for retaliation claims); *Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 611 (7th Cir. 2001)(noting the importance of temporal proximity when judging whether remarks could be "considered direct evidence of discrimination").

In addition, Tompkins has not presented evidence to establish that Esposito was involved in Defendants' decision to transfer or terminate him. It is undisputed that prior to Tompkins' transfer and termination, Henry became Tompkins' direct supervisor and Esposito became Henry's direct supervisor. (R SAF Par. 10). In spite of that fact, Tompkins argues that it was Esposito, not Henry, who controlled the decisions to transfer and terminate Tompkins. Tompkins bases such assertions solely on his own testimony indicating that Esposito had a reputation for being a micro-manager and indicating that, in the past, Esposito had micro-managed Tompkins with respect to such decisions. (R SF 29-30, 32-33, 72). However, "uncorroborated, self-serving testimony cannot support a claim if the testimony is based on speculation, intuition, or rumor." *Darchak*, 580 F.3d at 631 (citation omitted)(internal quotations omitted). Further, although Tompkins denies the fact that Esposito ever advised Tompkins that it was Henry's decision to transfer him, Tompkins testified in his deposition that when he complained to Esposito about the transfer, Esposito told Tompkins that Henry had not given her any explanation regarding the transfer. (R SF Par. 34); (Tompkins dep. 78-79). Since Tompkins has put forth only his personal speculation and has not pointed to sufficient evidence to show that Esposito was actually involved in the decision to transfer or terminate

Tompkins, any involvement Esposito had in the hiring of non-African American employees at the Matteson Branch would not support an inference of discrimination with respect to Tompkins' transfer or termination.

### B. Disciplinary Action Related to Audit

Tompkins argues that he has presented evidence that similarly-situated employees outside the protected class received systematically better treatment than Tompkins with respect to the Audit. The facts surrounding the Audit are undisputed. In late September or early October of 2007, Benes received a request from FlagStar, asking for a re-verification of certain deposits made by Worldwide. (R SF Par. 40-41). Such deposits had purportedly been verified by Tompkins on an earlier date, when Tompkins worked at the Matteson Branch. (R SF Par. 40-41). When Benes and Black sought to re-verify the information on the initial VOD Forms, they found no records indicating that the information reflected on the initial VOD Forms was accurate. (R SF Par. 44). At that point, Benes contacted Tompkins to inquire about the initial verifications and sent Tompkins the documents related to the Audit so that Tompkins could review them. (R SF Par. 45). Upon review of the documents, Tompkins realized that someone had forged his signature on the initial VOD Forms. (R SF Par. 46). Tompkins did not immediately share his knowledge that his signature had been forged on the initial VOD Forms, and instead decided to investigate the apparent forgery independently. (R SF Par. 47). As part of his independent investigation, Tompkins contacted Ramon Jackson (Jackson), the

9

president of Worldwide, and faxed Jackson the documents related to the Audit. (R SF Par. 48). On October 9, 2007, Tompkins re-verified the information that had been provided on the initial VOD Forms. (R SF Par. 52). Benes received additional requests for re-verification from FlagStar which could not be verified. (R SF Par. 51). In addition, Benes learned that FlagStar's fraud unit was investigating Worldwide and that Tompkins had re-verified the information provided on the initial VOD Forms. (R SF Par. 51-52). At that point, Benes contacted Henry to alert him to the fact that Tompkins might be involved in fraud. (R SF Par. 52). Henry then escalated the matter to Defendants' Corporate Security division (Corporate Security). (R SF Par. 53). Corporate Security interviewed Tompkins, ultimately found that Tompkins' actions related to the Audit had violated Defendants' Standards of Conduct in various ways, and recommended that Defendants terminate Tompkins, which Defendants did. (R SF Par. 54, 58, 61, 64-65, 69).

Tompkins argues that Benes and Black, who are both Caucasian, were treated better than Tompkins because they were not investigated or disciplined in connection with the Audit. In support of his argument, Tompkins contends that Benes and Black received the same VOD Forms as Tompkins, that Benes and Black also noticed an apparent forgery on the VOD Forms, that Benes and Black also gave the VOD Forms to an individual who might have been involved in the forgery, and that Benes and Black also failed to immediately escalate the matter to Henry or Corporate Security. (Resp. 6). Tompkins argues that for these reasons, Benes and Black were similarly-situated to him with respect to the Audit. Tompkins' argument that Benes

10

and Black are similarly-situated employees ignores the fact that it was Tompkins' signature that was purportedly on the VOD Forms, and that therefore Tompkins was the only employee in the unique position to know with certainty whether the signatures on the VOD Forms were forged. Tompkins was also the only employee to forward the documents related to the Audit to a party outside the bank. (R SF Par. 48). Further, Tompkins admitted that he signed the requests for re-verification on October 9, 2007, in spite of the fact that he knew as of October 5, 2007 that his signature had been forged on the initial VOD Forms. (R SF Par. 46, 52). Tompkins also admitted that, during the investigation, he denied having signed those same re-verification forms. (R SF Par. 62). Thus, with respect to the Audit, there are significant material differences between Tompkins and Benes or Black, and therefore Tompkins has not shown that they are similarly situated. In addition, the undisputed facts show that Corporate Security was not aware of Tompkins' race when it began investigating Tompkins for fraud. (R SF Par. 54). Further, the undisputed facts show that Corporate Security did evaluate Benes' and Black's conduct relating to the Audit and that only after completing its investigation did Corporate Security find that neither Benes nor Black had violated Defendants' Standards of Conduct. (R SF Par. 64). Defendants' treatment of Tompkins with respect to the Audit therefore does not create an inference of unlawful discrimination.

To the extent that Tompkins makes arguments regarding the propriety of or fairness of the Standards of Conduct that were applied to him at the time of the Audit, his knowledge or training regarding the applicable Standards of Conduct, or

11

whether his actions actually violated the applicable Standards of Conduct, Tompkins is improperly asking the court to assess the wisdom of Defendants' disciplinary decisions. *See, e.g., Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005)(stating that courts "'do not sit as a superpersonnel department' where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices")(quoting in part *Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004)). Based on the above, Defendants' investigation and disciplinary action relating to the Audit does not support an inference of unlawful discrimination.

### C. Evidence of Adverse Action and Pretext

Tompkins argues that he has presented evidence that his transfer and termination were adverse employment actions and that Defendants' reasons for such actions were a pretext for unlawful discrimination.

### 1. Tompkins' Transfer

Tompkins argues that his transfer from the Matteson Branch to the Joliet Branch was an adverse employment action. Tompkins also argues that he has presented evidence that Esposito was involved in the decision to transfer him and evidence that Benes was less-qualified to manage the Matteson Branch, which shows that Defendants' stated reasons for Tompkins' transfer were a pretext.

For a plaintiff to establish that he suffered an adverse employment action, he must show that his employer's actions "materially alter[ed] the terms and conditions of [his] employment" or, in other words, that he experienced a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a . . . significant change in benefits." *Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 703 (7th Cir. 2001)(citations omitted)(internal quotations omitted). It is undisputed that Tompkins' transfer did not result in a salary or title change. (R SF Par. 31). It is also undisputed that if a branch met certain targets, the branch manager would receive a bonus at the end of the year. (R SAF Par. 19). Tompkins argues that his transfer to the Joliet Branch reduced his bonus potential, but Tompkins has not presented sufficient evidence to support his own conclusory testimony and speculation as to that fact. Tompkins bases his assertions regarding his bonus potential on the fact that the Joliet Branch was smaller than the Matteson Branch, the fact that Tompkins already knew most of the customers at the Matteson Branch, and the fact that he did not expect to receive a bonus for his work at the Joliet Branch. (Resp. 8-9). Speculation does not suffice to create a genuine issue of fact. *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008)(citations omitted). Moreover, the fact that Tompkins may have had to work harder at the Joliet Branch to achieve a bonus does not mean that his bonus potential was reduced to the point that he experienced a significant change in benefits. Thus, Tompkins has not shown that his transfer to the Joliet Branch constituted an adverse employment action.

In addition, even if Tompkins could show that his transfer to the Joliet Branch constituted an adverse employment action, Tompkins has not shown that Defendants' reasons for the transfer were a pretext. In order to show that a defendant's legitimate non-discriminatory reason is a pretext for unlawful discrimination, a plaintiff must show that the reason is "a lie rather than an oddity or an error." *Everroad*, *v. Scott Truck Systems, Inc.*, 604 F.3d 471, 478-79 (7th Cir. 2010). Tompkins contends that he has shown that Defendants' stated reasons for his transfer were a pretext, arguing that he has shown that Esposito was involved in the decision to transfer him and that Benes was less-qualified to manage the Matteson Branch. As discussed above, Tompkins has not presented sufficient evidence showing that Esposito was involved in Defendants' decision to transfer Tompkins. In addition, it is undisputed that Bank of America officially took over LaSalle on October 1, 2007, and that Defendants' management structure changed as a result, so that one manager would no longer manage multiple branch locations, but would instead only manage one branch. (R SF Par. 24-26). It is also undisputed that when Tompkins was transferred from the Matteson Branch, he was replaced by Benes, who had previously been managing both the Joliet Branch and the New Lennox Branch, who had over thirty-seven years of banking experience, and who had managed a branch much larger than the Matteson Branch prior to joining LaSalle, when he worked for one of Defendants' competitors. (R SF Par. 35-36). In comparison, Tompkins had been a branch manager or assistant manager for approximately thirteen years and "was lauded for his ability to generate business at the Matteson location." (R SAF Par. 15). Thus,

14

Tompkins has not shown that Benes was less-qualified than Tompkins to manage the Matteson Branch.

Tompkins argues that his ability to generate new business was limited to the Matteson Branch because of his ties to the community there, and that Defendants' statement that Tompkins was transferred to the Joliet Branch to create new business was therefore a pretext for unlawful discrimination. However, it is undisputed that the Joliet Branch was a new branch and that there was a need to increase the commercial business there. (R SF Par. 29). Further, Tompkins has not presented any evidence indicating that Defendants knew or believed that Tompkins' skills in generating business at the Matteson Branch would not transfer over to the Joliet Branch. Instead, Tompkins offers only his own conclusions and speculation in this regard, which is not sufficient to show Defendants' stated reasons for Tompkins' transfer were a pretext. Based on the above, Tompkins has not shown that his transfer constituted an adverse employment action or that Defendants' stated reasons for the transfer were a pretext for unlawful discrimination.

2. Tompkins' Termination and Replacement with Kelly

Tompkins argues that Defendants' hiring of Kelly upon his termination is evidence that Defendants' reasons for Tompkins' termination were a pretext. As discussed above, the facts relating to the Audit are undisputed. Further, Tompkins has not presented sufficient evidence suggesting that Esposito had any involvement in Tompkins' termination or the hiring of Kelly to replace Tompkins. In addition, it

15

is undisputed that Kelly was employed as the assistant manager of the New Lennox Branch prior to Tompkins' termination, that upon Tompkins' "unplanned termination," Kelly was temporarily assigned to manage the Joliet Branch, and that it was some period of time before Kelly was officially promoted to manager of the Joliet Branch. (R SF Par. 74). Therefore, Tompkins has not shown that Kelly was unqualified to manage the Joliet Branch or that Defendants' reasons for Tompkins' termination were a pretext. The mere fact that Defendants hired a non-African American is not sufficient to show pretext. Since, even when considering all the facts together, Tompkins has not pointed to sufficient circumstantial evidence showing that there are triable issues as to whether unlawful discrimination motivated his transfer or termination, Tompkins cannot proceed on his discrimination claims under the direct method of proof.

II. Indirect Method

Tompkins argues that he is also able to proceed under the indirect method of proof. Under the indirect method of proof, a plaintiff must first make out a *prima facie* case of discrimination by establishing "(1) that he was a member of a protected class, (2) that he was performing his job satisfactorily, (3) that he suffered an adverse employment action, and (4) that [the defendant] treated a similarly situated individual outside [the] protected class more favorably." *Montgomery*, 626 F.3d at 394 (citing *Dear v. Shinseki,* 578 F.3d 605, 609 (7th Cir. 2009)). If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the

employer to present a legitimate non-discriminatory reason for the adverse employment action. *Everroad*, 604 F.3d at 477 (citing *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008)). If the employer offers such an explanation, the burden shifts to the plaintiff to show that the given reason was a pretext for unlawful discrimination. *Id.*

### A. *Prima Facie* Case

In regard to the *prima facie* case, it is not disputed that Tompkins belongs to a protected class. However, Defendants contend that Tompkins' transfer was not an adverse employment action, that Tompkins was not meeting Defendants' legitimate performance expectations at the time of his termination, and that Tompkins has not shown that similarly-situated employees outside the protected class were treated more favorably.

As discussed above, since Tompkins has not presented sufficient evidence that his transfer "materially alter[ed] the terms and conditions of [his] employment," Tompkins' transfer did not constitute an adverse employment action. *Stutler*, 263 F.3d at 703 (citations omitted)(internal quotations omitted). In addition, it is undisputed that Tompkins was terminated after Corporate Security investigated Tompkins and found that Tompkins had violated several of Defendants' Standards of Conduct. (R SF Par. 54, 58, 61, 64-65, 69). Thus, Tompkins has not shown that at the time of his termination, he was meeting Defendants' legitimate performance expectations. Further, Tompkins has not pointed to similarly-situated employees

17

outside the protected class who were treated more favorably.

When assessing whether a plaintiff has identified similarly-situated employees who were treated more favorably than the plaintiff, the court "must look at all relevant factors" to see if "there are sufficient common factors . . . to allow for a meaningful comparison in order to divine whether discrimination was involved in an employment decision." *McGowan v. Deere & Co.*, 581 F.3d 575, 579-80 (7th Cir. 2009). Thus, the plaintiff is required to identify a similarly-situated employee who is "directly comparable to the plaintiff in all material respects." *Montgomery*, 626 F.3d at 393. Tompkins has not shown that Benes or Black were similarly-situated employees since, as discussed above, there were significant material differences between Tompkins' conduct and the conduct of Benes or Black with respect to the Audit. Nor has Tompkins shown that Kelly is a similarly-situated employee, since Kelly was in no way involved in the Audit that led to Tompkins' termination. Based on the above, Tompkins has not established a *prima facie* case of discrimination with respect to either his transfer or termination.

### B. Legitimate Reason and Lack of Pretext

Even if Tompkins could establish a *prima facie* case of discrimination relating to his transfer or termination, as discussed above, Tompkins has not shown that Defendants' stated reasons for his transfer or termination were a pretext for unlawful discrimination. With respect to Tompkins' transfer, Tompkins failed to present sufficient evidence showing that Esposito was involved in the decision to transfer

18

Tompkins. Further, the undisputed facts show that Tompkins' transfer was the result of a change in management structure, which occurred when Bank of America took over LaSalle. (R SF Par. 24-26). In addition, Tompkins failed to show that Benes was less-qualified than Tompkins to manage the Matteson Branch or that Defendants knew or believed that Tompkins would not succeed in generating new business at the Joliet Branch. Thus, Tompkins has not shown that Defendants' reasons for transferring him to the Joliet Branch were a pretext for unlawful discrimination.

With respect to Tompkins' termination, the undisputed facts show that Defendants terminated Tompkins because they believed Tompkins had violated Defendants' Standards of Conduct. (R SF Par. 54, 58, 61, 64-65, 69). To the extent that Tompkins contends that Defendants were mistaken in their belief, Tompkins is improperly seeking to have the court evaluate the wisdom of his employer's business decisions. *Blise*, 409 F.3d at 867. In addition, Tompkins has not shown that Esposito had any involvement in Tompkins' termination or the hiring of Kelly to replace him. Nor has Tompkins shown that Kelly was unqualified to manage the Joliet Branch. Thus, Tompkins has not shown that Defendants' reasons for terminating him were a pretext for unlawful discrimination. Since Tompkins has failed to establish a *prima facie* case of discrimination and has failed to establish Defendants' reasons for his transfer and termination were a pretext, Tompkins cannot proceed on his discrimination claims under the indirect method of proof. Based on the above, the court grants Defendants' motion for summary judgment on Tompkins' IHRA discrimination claim, Tompkins' Title VII discrimination claim, and Tompkins' Section 1981 discrimination claim.

## CONCLUSION

Based on the foregoing analysis, the court grants Defendants' motion for summary judgment.

_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated: April 5, 2011